**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JTH TAX LLC d/b/a LIBERTY TAX SERVICE,
and SIEMPRETAX+ LLC,

                  Plaintiffs,

    v.

                              Case No: 6:20-cv-140-ADA

MICKEY WHITE,

And

NATTY'S TAX SERVICE,

                  Defendants.

**PLAINTIFFS' MOTION FOR ENTRY OF TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION
<u>AND MEMORANDUM OF LAW IN SUPPORT THEREOF</u>**

Plaintiff JTH Tax LLC (f/k/a JTH Tax, Inc.) d/b/a Liberty Tax Service ("Liberty") and SiempreTax+ LLC ("SiempreTax") (collectively, "Plaintiffs") move the Court to enter a temporary restraining order and preliminary injunction against their former franchisee, Defendant Mickey White ("White") and his business Natty's Tax Service ("Natty's") to prevent them from continuing to cause irreparable harm to Plaintiffs' business and goodwill.

## I.   <u>PRELIMINARY STATEMENT</u>

White operated Liberty and SiempreTax locations in Temple and Killeen, Texas pursuant to four franchise agreements (the "Franchised Businesses"). <u>Exs. A-D</u>; Decl. Chelliah ¶¶ 20-23. During his time as a franchisee, White breached his Franchise Agreements by, among other things, operating a competing tax preparation business under the name "Natty's Tax Service" at the principal place of business of his former Liberty franchise at 1400 W Adams Street, Temple, Texas, 76504 (TX044). *Id.* ¶¶ 43-50. After White failed to cure several material breaches of his Franchise Agreements, Liberty terminated the Franchise relationship on February 5, 2020. Ex. G.

In spite of his post-termination obligations under the Franchise Agreement, White continues to operate the same business out of the same location; use Liberty's confidential information, know-how, goodwill, and intellectual property; solicit former Liberty customers in connection with Natty's; and has failed to turn over all customer lists, files, records, and Plaintiffs' confidential Operations Manuals. Decl. Chelliah ¶¶ 43-50. These actions violate the Franchise Agreement, the Mutual Termination Agreement, and Virginia and Texas law.

Pursuant to Section 10(h) of the Franchise Agreements, Defendant White agreed Liberty would have the right to entry of a preliminary injunction enforcing the provisions of the Franchise Agreements. *See* Ex. A §§ 9-10. Thus, Plaintiffs seek preliminary injunctive relief to prevent

Defendants from causing further irreparable harm by using Plaintiffs' trade secrets and confidential information in operating a competing business.

## II.   STATEMENT OF FACTS

### A.   The Parties

Liberty is a franchisor of Liberty Tax Service® income tax preparation service centers located throughout the United States, including the State of Texas. Decl. Chelliah ¶ 5. SiempreTax is a wholly owned subsidiary of Liberty, which focuses on providing bilingual tax preparation services to Latino customers. *Id.* ¶ 6. Liberty has grown to be one of the largest tax preparation franchises in the United States. *Id.* ¶ 18. Liberty plays an important role in the local Killeen and Temple, Texas economies, as well as nation-wide, with a network of over 12,000 tax preparers. *Id.* ¶ 19. Plaintiffs' busiest time of year is January through April, during which the majority of returns are prepared. *Id.* ¶ 20.

Liberty grants licenses to franchisees to use its federally-registered trademarks, services, marks, logos, and derivations thereof (the "Marks") and participate in its confidential and proprietary business system pursuant to written franchise agreements, which are reasonably tailored to protect Liberty's valuable trade secrets, reputation, goodwill, and other legitimate business interests. *Id.* ¶ 14. Liberty's Marks include the iconic Liberty Tax logo, the Lady Liberty logo, and the phrase "cash in a flash." *Id.* ¶ 8; Exs. J-P.  The Marks have become associated in the minds of consumers with uniform goods and consistently high quality services provided only to persons following Liberty's approved sales, operating methods, and procedures. *Id.* ¶ 16.

Liberty discloses certain confidential information, including methods of franchise operation, customer information, and marketing information, to franchisees through its Operations Manual, training manuals and programs. Decl. Chelliah ¶ 15. To protect its confidential information

and trade secrets, Liberty requires that its franchisees agree that upon expiration, termination, or nonrenewal of a franchise agreement, the former franchise will: (1) never use, disclose, or permit the use or disclosure of its confidential information in any manner whatsoever, (2) stop using all literature and forms received by Liberty, and (3) deliver to Liberty all customer information, along with copies of its Operations Manual and any updates thereto. *Id.* In order to protect the integrity of the confidential information disclosed to its Franchisees, Liberty's Franchise Agreements require the Franchisee to protect confidential information during their term and refrain from using it for any other purpose after their term is over. Ex. A § 12 (c).[1]

White is a former Liberty franchisee pursuant to three Franchise Agreements[2] (collectively, the "Franchise Agreements"), pursuant to which he owned the Franchised Businesses. Decl. Chelliah ¶¶ 21-24. White operated the TX044 Franchised Business from 1400 W Adams Street, Temple, Texas, 76504 (the "TX044 Franchise Location") and TX468 from 1103 W Veterans Memorial Blvd., Killeen, TX 76541 (the "TX468 Franchise Location). *Id.* ¶¶ 21, 23. In or before January 2020, Natty's began operations at 1400 W Adams Street, Temple, Texas 76504 and, as a result, Defendants are soliciting business from former Liberty customers. *Id.* ¶¶ 46-49.

### B.    The Franchise Agreements

The Franchise Agreements are for territories in Texas known as TX044, TX466, and TX468 (collectively, the "Territories"). Exs. A-C at Schedule A. Each Franchise Agreement had

---

[1] For the purposes of this instant Motion, Liberty shall refer to provisions in Ex. A when citing to the Franchise Agreements. However, the terms, conditions, and provisions of the Franchise Agreements which governed Defendants' ownership and operation of the respective Franchise Businesses, are the same in all material respects. *See generally* Exs. A-C.

[2] A copy of the TX044 Franchise Agreement (09/26/2016) is attached as Ex. A; a copy of the TX466 Franchise Agreement (04/28/2017) is attached as Ex. B; a copy of the TX468 Franchise Agreement (01/14/2019) is attached as Ex. C.

a five-year term and contained specific terms for renewal. *See* Ex. A § 2(a), (b). Pursuant to the Franchise Agreements, Plaintiffs provided Defendant White with training in related to its franchise operation, marketing, advertising, sales, and business systems. *Id.* § 1; Decl. Chelliah ¶ 26. In exchange for Liberty's grant of a franchise that allowed Defendant White to "operate a tax return preparation business using Liberty's system and Liberty's Marks within the Territory," Defendant White agreed to certain in-term and post-term obligations set forth in the Franchise Agreements. *Id.* ¶¶ 23-39.

Defendant White was required, pursuant to Section 6(g) of the Franchise Agreements, to "use the software Liberty provides [and] not use, install or allow to be installed any other federal or state personal income tax return preparation or electronic filing software on any computer used in the Franchised Business, without Liberty's prior written consent." Decl. Chelliah ¶ 28.

Defendant White acknowledged and agreed the non-compete provision of Section 10 of the Franchise Agreements are "reasonable, valid and not contrary to the public interest and [that he waives] all defenses to the strict enforcement thereof." *Id.* ¶ 36; Ex. A § 10(h). Indeed, these covenants are necessary to protect Liberty's legitimate, protectable interest in its franchise business, including but not limited to:

    A.    Maintaining and protecting Liberty's goodwill and customer loyalty;

    B.    Retaining customer relationships;

    C.    Liberty's customer lists, customer identification, tax returns, and other confidential and trade secret information; and

    D.    Preserving Liberty's ability to facilitate the operation of Liberty franchises where the Franchise Location is currently located.

*Id*. ¶ 35. Defendant White further agreed that "Liberty is entitled to a temporary restraining order, preliminary and/or permanent injunction for any breach of duties under any of the non-monetary obligations of Sections 9 and 10." Ex. A § 10(h).

In pertinent part, White's post-trial obligations included the following:

1.      To returns all copies of documents, confidential information, and intellectual property *Id.* § 9(g)-(h).

2.      To not solicit Liberty customers within 25 miles of the Territory "for a period of two (2) years following the termination[] of the Franchised Business." *Id*. § 10(b).

3.      To not disclose any of Plaintiffs' confidential information. Ex. A § 12(a)-(c).

4.      To not compete with Plaintiffs within 25 miles of the Territory "for a period of two (2) years following the termination[] of the Franchised Business." Ex. A § 9(k).

Pursuant to the Franchise Agreements, a violation of any of these provisions should be enjoined. Ex. A § 10(h).

## C.      **Termination of the Franchise Agreements**

Pursuant to Sections 8(c)(i) and 8(c)(ii) Liberty is allowed to terminate the Franchise Agreements upon seven days' notice and opportunity to cure, which includes, *inter alia*, violations of the Franchise Agreements, any other agreement with Liberty or the Operations Manual, or failure to pay amounts owing that are more than thirty days past due. Decl. Chelliah ¶ 44.

Eventually, Liberty discovered that White had created a new EFIN with Natty's and had been preparing tax returns at the Former Franchise Location. *Id*. ¶¶ 46-49. Notably, White and Natty's were continuing to use old and altered Liberty Marks, vestiges for Liberty's trade dress, and slogans and programs mimicking Liberty and SiempreTax. *Id.*; Ex. R.

On January 22, 2020, Liberty sent Notices to Cure Default to Defendant White and identified the operation of Natty's as one of several breaches of the Franchise Agreements. Ex. F; Decl. Chelliah ¶ 44. Liberty informed Defendant White that he was in violation of, *inter alia*, Sections:

- 6(s) of the Franchise Agreements for operating an unapproved business;

- 8(b)(v) for discontinuing the active operation of the Franchised Business at the franchise location;

- 8(c)(ii) for failing to pay monies to Liberty when due; and

- 6(h) for failing to maintain a telephone number and/or answering machine.

Ex. F. The Notices specifically reminded Defendant White to cure his breaches of the Franchise Agreements, to pay amounts due and owing to Liberty, and to maintain an operational telephone and/or answering machine. *Id.* ¶ 41; Exs. F, G.

On February 5, 2020, after providing the requisite notices and opportunities to cure, Liberty terminated the Franchise Agreements (the "Termination Notice"). Ex. R; Decl. Chelliah ¶ 44. The Termination Notice reminded White of his post-termination obligations, *inter alia*, to: (i) refrain from any further use of any of Liberty's licensed marks, (ii) not identify himself as a current or former Liberty franchisee, pay all amounts due and owing to Liberty, (iii) surrender all client files and the Operation Manuals, (iii) assign the phone numbers used by and associated with the Franchise Location, and (iv) comply with the covenants not to compete and not to solicit for a period of two-years. Ex. I; Decl. Chelliah ¶ 45.

### D.     Breaches of the Franchise Agreements

White's multiple breaches, include but are not limited to, in-term competition, failure to continue active operations, post-term covenant not to compete, and failure to pay amounts due and

owing to Liberty, of which $55,194.18 was more than thirty-days past due at the time of termination. Ex. G. Despite his post-termination obligations, White's breaches include individually, and in concert with Natty's, preparing and/or continuing to solicit and prepare tax returns for Liberty customers for whom Defendant prepared returns while operating his former Franchise Businesses. Decl. Chelliah ¶¶ 43-49. Specifically, White breached the Franchise Agreement in several material ways.

After Liberty terminated the Franchise Agreements, White failed to deliver the original and all copies of lists and other sources of Liberty client information containing the names, addresses, e-mails, or phone numbers of customers who patronized the Franchise Businesses. Id. ¶ 43. White also failed to deliver the original and copies of customer tax returns, files, and records, and Liberty's confidential Operations Manual. Id. In doing so, he breached Sections § 9(g)-(h).

Since at least January 2020, Defendants have been offering tax preparation services using Liberty's trade secret and confidential information. Decl. Chelliah ¶¶ 43-49. White unlawfully disclosed to Natty's and Natty's unlawfully obtained access to and possession of Liberty's trade secrets and confidential information, including but not limited to, Liberty's customer contact information, tax records and files, Operations Manual, and business know-how to establish a competing tax preparation business at the TX044 Franchise Location. Decl. Chelliah ¶¶ 46-48.

Additionally, since at least January 2020, Defendants have operated a competing tax business and solicited tax preparation business from former Liberty customers at the former Franchise Location (within the borders of the territory). Id. ¶¶ 43-49; Ex. H. In doing so, Defendants have also used Plaintiffs' marks. Ex. S. As result, they have violated Sections 9(k) and 10(b) of the Franchise Agreements and caused Plaintiffs irreparable harm. Decl. Chelliah ¶ 51.

III.   **ARGUMENT**

The standard for obtaining a temporary restraining order and the standard for obtaining a preliminary injunction are, in essence, the same. *Pizza Hut, Inc. v. White*, Civil Action No. 3:02-CV-0790-L, 2002 U.S. Dist. LEXIS 19930, at *4 (N.D. Tex. Oct. 18, 2002) (citing *Canal Auth. of the State of Florida v. Callaway,* 489 F.2d 567, 572 (5th Cir. 1974) (en banc)). A preliminary injunction under FED. R. CIV. P. 65(a) requires the Plaintiff to establish the following factors: "(1) there is a substantial likelihood that it will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to Defendant; and (4) a preliminary injunction or temporary restraining will not disserve the public interest." *Pizza Hut*, 2002 U.S. Dist. LEXIS 19930, at *5; *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). Plaintiffs' evidence establishes all of the relevant factors. Accordingly, preliminary injunctive relief is appropriate.

    A.   **Liberty is Likely to Succeed on the Merits of Its Claims.**

        1.   **Breach of the Franchise Agreements and Mutual Termination Agreement (Counts I, II, and III)**

Liberty is likely to succeed on the merits on its contract-based claims, including for breaches of the Franchise Agreements and its post-termination provisions. To succeed on a breach of contract claim, Virginia law[3] requires: (1) a legally enforceable obligation of defendant to

---

[3] Virginia law governs all claims that relate to or arise out of the Franchise Agreements or any of the dealings of the parties hereto. Ex. A § 17(a). Virginia recognizes choice of law and forum selection clauses bargained for between parties. *Paul Bus. Sys., Inc. v. Canon U.S.A., Inc.*, 240 Va. 337, 342, 397 S.E.2d 804 (1990) (stating "where parties to a contract have expressly declared that the agreement will be construed as made with reference to the law of a particular jurisdiction, we will recognize such agreement and enforce it, applying the law of the stipulated jurisdiction").

plaintiff; (2) defendant's violation or breach of that obligation; and (3) injury or damage to plaintiff caused by the breach of that obligation. *Filak v. George*, 267 Va. 612, 619, 594 S.E.2d 610 (2004).

Defendant White signed valid and enforceable Franchise Agreements, and expressly agreed to, *inter alia*, its non-competition, non-disclosure, and non-solicitation covenants. Exs. A-D; Decl. Chelliah ¶¶ 21-24. Despite Liberty's termination of the Franchised Business, Defendants continued to violate its agreed-upon obligations pursuant to the Franchise Agreements. Exs. E, F; Decl. Chelliah ¶¶ 43-49. Following the Mutual Termination Agreement (Ex. E), Defendants have been soliciting Liberty's customers whom White served at the Franchise Business(es) and preparing and electronically filing income tax returns within twenty-five miles of the Franchised Businesses. Decl. Chelliah ¶¶ 43-49.

Specifically, the undisputed evidence will show that White breached the following provisions of his Franchise Agreements and Mutual Termination Agreement in five notable ways. First, White retained customer lists, original and all copies of client files, tax returns, and Liberty's confidential Operational Manual. *Id.* ¶ 41; *see also* Ex. A § 9(g), (h). Second, White has solicited and continues to solicit tax preparation business from former Liberty customers in association with Natty's. Decl. Chelliah ¶¶ 43-49; *see also* Ex. A § 10(d). Third, White has shared Liberty's confidential information, including client lists as part of his operation of Natty's. Decl. Chelliah ¶¶ 47-49; Ex. A § 12(a), (c). Fourth, by doing the above, White has continued to compete in violation of the Franchise Agreement's noncompetition clause.

White may argue that the non-compete clause is void; however, it is not. Consistent with the laws of Virginia and this Circuit, the non-competition provisions in the Franchise Agreements are narrowly tailored and are necessary to protect Liberty's goodwill and reputation. Courts have repeatedly enforced the post-termination duties contained in Liberty's franchise agreements and

recognized the reasonableness of its non-competition and non-solicitation covenants. *See e.g., JTH Tax, Inc. v. Fein*, No. 2:08cv21, slip op. at 14-15 (E.D. Va. Dec. 22, 2008) *aff'd*, No. 09-1321, 352 Fed. Appx. 766 (4th Cir. Nov. 18, 2009) (applying Virginia law in its determination to uphold post termination duties in Liberty franchise agreement and two-year, 25-mile non-compete and non-solicit clauses); *Capital One Fin. Corp. v. Kanas*, 871 F. Supp. 2d 520, 534-35 (E.D. Va. 2012) (upholding five-year non-compete); *Fein*, No. 2:08cv21, slip op. at 14-15, *aff'd*, 2009 U.S. App. Lexis 25286 (upholding two-year, 25-mile non-compete and non-solicit clauses); *Lee*, 514 F. Supp. 2d at 825 (same); *Donofrio*, 2006 U.S. Dist. LEXIS 73692, at *13 (same); *See Alex Sheshunoff*, 209 S.W.3d 644, 656 (Tex. 2006) (covenant prohibited employee from providing consulting services to employer's clients for one year and from selling competing product for two years)*; Amey v. Barrera,* No. 13-01-00130-CV, 2004 Tex. App. LEXIS 360, 2004 WL 63588 (Tex. App.--Corpus Christi Jan. 15, 2004, no pet. h.) (covenant prohibited flower shop seller from doing any floral business in city where shop was located or in surrounding area for five years); *Stone v. Griffin Commc'ns and Security Sys., Inc.,* 53 S.W.3d 687 (Tex. App.--Tyler 2001, no pet. h.) (covenant prohibited employee from competing in territory in which employee worked during his employment for five years). Courts have also upheld limited duration agreements that "[prohibit] competition by persons with access to another business' confidential information, goodwill, customer relationship or competitive business advantage." *JTH Tax, Inc. v. Fein*, No. 2:08cv21, slip op. at 14-15 (E.D. Va. Dec. 22, 2008) *aff'd*, No. 09-1321, 352 Fed. Appx. 766 (4th Cir. Nov. 18, 2009).

Notwithstanding Liberty's good faith adherence to the terms of the Franchise Agreements, White has been violating his contractual obligations by soliciting Liberty's customers and competing with Liberty within 25 miles of the TX044 and TX466 Territories and White has

continued to violate his contractual obligations.  Decl. Chelliah ¶¶ 43-49. As such, Liberty will succeed on its claim for breach of the Franchise Agreements and its post-termination duties, and thus injunctive relief should be granted.

### 2.      Trademark Infringement & Dilution (Counts VI and VII)

Although the Lanham Act establishes separate causes of action under Section 32 and Section 43(a), "'[t]he same tests apply to both trademarks and trade dress to determine whether they are protectable and whether they have been infringed, regardless of whether they are registered or unregistered.'" *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 236 (5th Cir. 2010) (quoting *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 536 (5th Cir. 1998)). To succeed in an infringement claim under the Lanham Act, Plaintiffs must first "establish ownership in a legally protectable mark, and second . . . show infringement by demonstrating a likelihood of confusion." *Amazing Spaces*, 608 F.3d at 235-36 (quoting *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 474 (5th Cir. 2008); citing *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008)).

In this case, White failed to return materials with Plaintiffs' Marks after Plaintiffs terminated the Franchise Agreements on February 5, 2020. Decl. Chelliah ¶ 43. Plaintiffs have valuable rights associated with their protected Marks and White not only failed to return all such Marks, but he continues to use the Marks at the Franchised Location for his own benefit and that of Natty's in flagrant violation of Section 32 of the Lanham Act at 15 U.S.C. 1114. Specifically, White continued to use a Liberty sign, confusingly similar images of the statue of Liberty, and slogans and marketing materials that mimic Plaintiffs' materials. Ex. S; Decl. Chelliah ¶ 8. The Defendants have no lawful claim to the Marks and the continued unauthorized use necessarily causes unlawful dilution.

"Common sense" indicates the continued use of a terminated mark results in confusion. *Ramada Franchise Sys. v. Jacobcart, Inc.*, Civil Action No. 3:01-CV-0306-D, 2001 U.S. Dist. LEXIS 6650, at *7 (N.D. Tex. May 17, 2001) (citing *Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983)).   Here, common sense shows that White used materials that were either identical to Plaintiffs' or would confuse customers into believing that they were doing business at a Liberty location. *See* Ex. S.

White used Liberty's goodwill and reputation, along with its proprietary materials and franchise system to lure Liberty's customers to Natty's. Decl. Chelliah ¶ 46. Natty's is not and was never a Liberty franchisee. *Id.* ¶ 47. Natty's improper use of Liberty's Marks in the operation of Natty's will likely cause current and prospective customers to become deceived and/or confused into believing that the services rendered by Defendants were those of Liberty. It is well settled law, especially in franchise relationships, the terminated franchisee cannot continue to operate the same type of business as the franchise, using the Marks and indicia of the franchisor, at the former franchise location and avoid confusing the public with regard to the products or services offered. *Pizza Hut*, 2002 U.S. Dist. LEXIS 19930; *Petro Franchise Sys., LLC v. All Am. Props., Inc.*, 607 F.Supp.2d 781, 797 (W.D. Tex. 2009). By failing to return Liberty's intellectual property, Defendants intentionally attempted to deceive customers for their own business reasons. As such, Liberty submits that it will succeed on the merits of its Lanham Act claims against Defendants.

### B.    Liberty Suffers Irreparable Harm Without Injunctive Relief.

Plaintiffs have suffered and will continue to suffer irreparable harm if Defendants are allowed to engage in their pattern of unlawful behavior. A showing of irreparable injury is the *sine qua non* of injunctive relief. *Tex. First Nat'l Bank v. Wu*, 347 F. Supp. 2d 389, 398 (S.D. Tex. 2004). Irreparable harm is neither speculative nor remote, but is actual and imminent. *See United*

*States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953). Although economic losses alone do not justify a preliminary injunction, the loss of customers and goodwill is an irreparable injury. *See Ruscitto v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 777 F. Supp. 1349, 1354 (N.D. Tex.) (Fitzwater, J.), *aff'd*, 948 F.2d 1286 (5th Cir. 1991) (per curiam). Because Defendants' refusal to adhere to other post-termination obligations is likely to cause confusion and deception, there is a strong presumption of irreparable harm. *See Lorillard Tobacco Co. v. S&M Brands, Inc*., 616 F. Supp. 2d 581, 587 (E.D. Va. 2009) (citing *Scotts Co. v. United Indus. Corp*., 315 F.3d 264, 273 (4th Cir. 2002)) ("In Lanham Act cases involving trademark infringement, a presumption of irreparable injury is generally applied once the plaintiff has demonstrated a likelihood of confusion."). Where, as here, there is a real possibility of permanent loss of customers to a competitor or the loss of goodwill due to Defendants' behavior, the irreparable injury prong is satisfied. *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Oper. Co.*, 22 F.3d 546, 552 (4th Cir. 1994); *Olivo*, 2016 U.S. Dist. LEXIS 17857, at *10 (E.D. Va., Feb. 12, 2016); *JTH Tax, Inc. v. Donofrio*, 2006 U.S. Dist. LEXIS 73692, at *14 (E.D. Va. 2006); *JTH Tax, Inc. v. Lee,* 514 F. Supp. 2d 818, 825 (E.D. Va. 2007). *See also ServiceMaster Residential/Commercial Servs., L.P. v. Westchester Cleaning Servs., Inc*., 2001 WL 396520, at *3 (S.D.N.Y. Apr. 19, 2001); *Jiffy Lube Int'l, Inc. v. Weiss Bros*., 834 F. Supp. 683, 692 (D.N.J. 1993) (allowing the operation of a competing franchise "at the very site" of former franchise location, "even without" the franchisor's mark, "would greatly impair plaintiff's ability to establish another franchise in the area.").

It is impossible for Plaintiffs to control their reputation and goodwill when rogue former franchisees, like Defendants, operate competing businesses using Plaintiffs' business system without regard for the terms and conditions of the franchise agreement. Without a preliminary injunction, Defendants will continue to capitalize on the training, operating system, tools, and the

knowledge Plaintiffs gave White for the sole purpose of building up his client base and operating a successful Franchised Businesses. Defendants' actions will result in the permanent loss of Plaintiffs' customers and goodwill. *Molex, Inc. v. Nolen*, 759 F.2d 474, 478 (5th Cir. 1985) ("irreparable harm may be shown in customer theft situations."); *Alliantgroup, L.P. v. Feingold*, No. H-09-0479, 2009 U.S. Dist. LEXIS 40140, at *4 (S.D. Tex. May 11, 2009) ("The use of an employer's confidential information and the possible loss of customers is sufficient to establish irreparable harm."). Any misuse by Defendants of their access to Liberty's highly confidential, sensitive, and lucrative data and information, results in immediate, irreversible harm that damages the integrity of Liberty's franchise system and reputation, which cannot be remedied by money damages. Decl. Chelliah ¶ 51. Defendants are not only misleading the public by suggesting that they are still associated with the Liberty franchise system, but they are also depriving Liberty of the opportunity to control the quality of services associated with its franchise. *Id.* at ¶¶ 42, 51.

Liberty has suffered and will continue to suffer irreparable harm to its franchise system as a whole should Defendants be permitted without consequence to operate a competitive business in violation of the non-competition and non-solicitation provisions in the Franchise Agreements. The value of a Liberty franchise would decline if a franchisee knew that others could, without adverse consequence, simply take advantage of Liberty's franchise system without abiding by the terms of a valid franchise agreement. *Id.* at ¶ 51; *TGI Friday's, Inc. v. Great Nw. Rests., Inc.*, 652 F. Supp. 2d 763, 772 (N.D. Tex. 2009) ("when a former franchisee continues to pass itself off as a licensed franchise, there is usually a substantial threat of irreparable harm to the franchisor."). In fact, franchisees expect that they and other franchisees will uphold their obligations pursuant to their respective franchise agreements to protect the goodwill associated with the Liberty brand and

business opportunities inherent in operating within the Liberty franchise system.[4] Decl. Chelliah ¶¶ 42, 51. In short, allowing a franchisee to profit from the fruits of a franchisor's goodwill without consequence threatens to undermine and even destroy the franchise model. *Id.* Liberty suffers irreparable harm to its ability to protect its confidential information and customer goodwill through Defendants' violation of the non-competition and post termination provisions in the Franchise Agreements, which irrevocably harms Liberty and necessitates injunctive relief. *Id.*

Without a preliminary injunction, Defendants will continue to capitalize on the training, operating system, tools, materials, and knowledge Liberty gave White for the sole purpose of operating successful Liberty franchises in Texas. *Petland, Inc. v. Hendrix,* Case No. 2:04-cv-224, 2004 U.S. Dist. LEXIS 32591, at *18, 2004 WL 3406089 (S.D. Ohio Sep. 14, 2004) (granting preliminary injunction because former franchisees were "operating the pet store in the *exact same location* as the Petland store" and "thus serving customers who, but for the presence of [their] store, might otherwise shop at a Petland franchise"). Continuing to hold out as a Liberty franchisee and soliciting business from former Liberty customers undoubtedly diverts customers to Natty's. Decl. Chelliah ¶ 46. Further, White's retention of Liberty's confidential Operations Manual and other proprietary information allows Defendants to use Liberty's competitive business model and techniques resulting in the permanent loss of Liberty's customers and goodwill. *Id.* Defendants' actions will result in irreparable injury which cannot be repaired, retrieved, or atoned for by monetary compensation. Thus, injunctive relief should be granted.

### C.   The Injury to Liberty Outweighs the Threatened Harm.

---

[4] The goodwill generated by a franchise agreement belongs to the franchisor, not its franchisees. When a franchise agreement is terminated, goodwill reverts back to the franchisor. *Economou v. Physicians Weight Loss Centers*, 756 F. Supp. 1024, 1032 (N.D. Ohio 1991). The sale of a franchise, including attendant customer goodwill, is a protectable interest held by Liberty and is not something Defendants have authority to convey to Natty's or anyone else.

A court need not balance hardships when the defendant's conduct has been willful. *United States v. Marine Shale Processors*, 81 F.3d 1329, 1359 (5th Cir. 1996). Defendants acted willfully by breaching provisions that they repeatedly agreed to abide by, using confidential information, and holding themselves out as Liberty-branded shop after their rights to the Marks have been revoked. *See supra* § II. Defendant took these actions with the specific intent to capture the benefits of being a franchisee and the attendant national recognition without paying for the right or abiding by the terms of the Franchise Agreements. Decl. Chelliah ¶ 46. Therefore, the Court need not balance hardships in this case.

Even if the Court were to balance hardships, the harm that Plaintiffs are currently suffering, and will continue to suffer if the preliminary injunction is not granted, far outweigh the harm that might be caused to Defendants by the granting of the temporary restraining order and preliminary injunction. Requiring White to abide by his contractual obligations is necessary to protect Plaintiffs' legitimate, protectable interest in their franchise businesses. The denial of an injunction will adversely affect Plaintiffs' other franchisees that play by the rules and abide by the terms of franchise agreements. *Bad Ass Coffee Co. of Haw., Inc. v. JH Nterprises, L.L.C.*, 636 F. Supp. 2d 1237, 1249 (D. Utah 2009) ("If the non-compete clauses at issue are not upheld in this case, it would be reasonable to think that other BACH franchisees might be emboldened to follow in Defendants' footsteps."); *Quizno's Corp. v. Kampendahl*, No. 01 C 6433, 2002 U.S. Dist. LEXIS 9124, at *22 (N.D. Ill. May 20, 2002) (a franchisee's "willful violation of the Agreement sends a message to other franchisees that the Agreement does not protect [the franchisor] and may be disregarded at will."). Licensed franchisees have placed their trust in Plaintiffs to protect their substantial investment in the

system, and have a significant interest in preventing former franchisees from operating without following the franchise's established policies and procedures. Decl. Chelliah ¶ 47.

A preliminary injunction enjoining Defendants from using Liberty's confidential information, and wrongfully competing with Plaintiffs would not be a significant burden. "Generally, a franchisee that has breached the terms of its franchise agreement cannot then complain of harm from an injunction preventing further violations of the agreement." *Winmark Corp. v. Brenoby Sports, Inc.* 32 F. Supp. 3d 1206, 1224 (S.D. Fla. 2014) (finding in favor of the Plaintiff/Franchisor because it has "established that [Defendants'] violation of the post-termination non-compete agreement will impair its goodwill and reputation in the community, impair its ability to maintain a market presence, and erode the pattern and practice of uniform contract interpretation and performance within [its] franchised system"); *see also Jackson Hewitt Inc. v. Madan,* 83 Fed. App'x. 417, 420 (3d Cir. 2003) (balance of harms favored granting a tax preparation franchisor's motion for preliminary injunction against former franchisee to enforce non-compete duties); *Jiagbogu v. Popeyes Famous Fried Chicken Corp.*, 1994 U.S. Dist. LEXIS 10343, at *7 (E.D. La. July 22, 1994) (the harm sustained by franchisor should a preliminary injunction not issue outweighed harm that might result to former franchisee by issuance). In contrast to the irreparable harm suffered by Plaintiffs, any harm to Defendants is self-inflicted and thus cannot be deemed irreparable as a matter of law. *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995) (self-inflicted harm cannot be deemed "irreparable"); *Winmark Corp.*, 32 F. Supp. 3d at 1224 (no harm where "refus[ed] to abide by their contractual obligations").

Defendants were aware of the post-termination obligations and restrictions in the Franchise Agreements and the Mutual Termination Agreement. Exs. A-E; Decl. Chelliah ¶¶ 21-24. Defendants forced Liberty to invoke the restrictive covenants set forth in the Franchise Agreements

because of White's continuing violations of the post-termination obligations. *Id.* at ¶¶ 43-50. Defendants cannot in good faith claim that an injunction preventing them from engaging in unlawful actions and omissions would be a hardship to them. Defendants will not suffer cognizable harm if injunctive relief is granted because Liberty's disclosure of trade secrets and confidential information harms its ability to compete in the Territories with Defendants. *Henkel Corp. v. Cox*, 386 F. Supp. 2d 898, 904 and n.2 (E.D. Mich. 2005).

White freely accepted the restrictions under the Franchise Agreements in exchange for the benefits received at the time the Franchise Agreements were executed. An injunction compelling Defendants to comply with the post-termination covenants would not be a significant burden. It would merely be enforcing contractual terms White agreed to in the Franchise Agreements, bringing the parties back to the *status quo ante*. Indeed, Defendants are free to operate a different type of business or offer an income tax preparation business anywhere outside the 25-mile radius between February 5, 2020 and February 5, 2022. Ex. A § 10(b). After that, they are free to offer income tax preparation services anywhere they please. Liberty respectfully submits the balance of harms weighs decisively in favor of granting its request for injunctive relief.

### D.     Granting Injunctive Relief Does Not Disserve the Public.

The public interest factor also weighs in favor of granting Liberty's request for injunctive relief. Here, the public has dual interests in enforcing restrictive covenants that protect legitimate business interests and maintaining the integrity of a franchise system. *Henkel Corp.*, 386 F. Supp. 2d at 904 ("The public interests in protecting confidential information and in enforcing valid [] contracts and the non-confidentiality agreements within weigh in favor of issuing the preliminary injunction."). It is in the public's best interest to enforce restrictive covenants that protect legitimate business interests and maintain the integrity of the franchise system. *N. Am. Prods.*

*Corp. v. Moore*, 196 F. Supp. 2d 1217, 1231 (M.D. Fla. 2002)*; Winmark Corp.*, 32 F. Supp. 3d at

1224 (finding that "the public interest in the enforcement of contracts weighs in favor of enjoining

[Defendants] from any further violation of the non-compete provision of the Franchise

Agreement"); *Petro Franchise Sys., LLC v. All Am. Props., Inc.*, 607 F.Supp.2d 781, 797 (W.D.

Tex. 2009) (public interest is served by granting franchisor's application). Indeed, it is in the

public's best interest to support contractual enforcement and to prevent competition in violation

of a valid restrictive covenant. Consumer confusion has occurred and will continue to occur in

light of the fact that Defendants continue to operate an income tax preparation business at the

Franchise Location, in direct competition with Plaintiffs. Accordingly, the final factor also weighs

in favor of granting Liberty injunctive relief.

       **E.**       **Defendants Waived the Rule 65(c) Bond Requirement.**

      Although Fed. R. Civ. P. 65(c) generally requires the moving party to post bond in order

to obtain an injunction, a party may waive the right to bond. *Gordon v. City of Hous.*, 79 F. Supp.

3d 676, 695 (S.D. Tex. 2015) (citing *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir.

1996)). Additionally, it is within the sound discretion of this court to determine the amount of

bond, if any. *Kaepa*, 76 F.3d at 628. A Court may order no bond in appropriate situations.

*ODonnell v. Harris County*, 251 F. Supp. 3d 1052, 1159 (S.D. Tex. 2017) ("A federal court may

waive the bond requirement.").

      In this case, White waived any requirement that Liberty post bond in Section 10(g) of the

Franchise Agreements. Ex. A § 10(g). In as much as it appears White is directing the activities of

Natty's, Plaintiffs submit they should not be required to submit a bond. Since, at least, January

2020, Defendants have been operating one or more tax preparation services in the TX044 Territory

and within 25-miles of the TX466 and TX468 Territories. Decl. ¶ 44. White utilizes Natty's as the

vehicle through which he violated and will continue to violate his post-termination obligations. Defendants should not be allowed to renege on provisions in valid and enforceable agreements. Accordingly, Liberty should not be required to post bond, especially as this Motion is unlikely to result in wrongful enjoinment.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Liberty respectfully requests application for a Temporary Restraining Order and Preliminary Injunction be granted and the Court order the following relief:

1.   Enjoin Defendants from continuing to operate a tax preparation business out of any previous Franchise Businesses;

2.   Enjoin Defendants from using any telephone number of any former Franchise Businesses;

3.   Enjoin Defendants from preparing or electronically filing income tax returns and offering Financial Products within the Territories or within 25-miles of the Territories set forth in the Franchise Agreements;

4.   Enjoin Defendants from providing tax preparation services to any customers served by the former Franchise Businesses;

5.   Enjoin Defendants from using any confidential information from manuals or system provided by Liberty;

6.   Order Defendants to remove any internet references to tax preparation in the Territories;

7.   Order White to return to Liberty, at his own expense, all materials provided by Liberty to Defendants, including, without limitation, all manuals, customer lists, advertising material, stationery and printed forms and all other matters relating to the operation of the Franchises and/or bearing the Marks;

8.   Order White to deliver to Liberty, at its own expense, any original and all copies, including electronic copies and media, of lists and other sources of information containing the names, addresses, e-mail addresses, or phone numbers of customers who patronized the Franchised Businesses, and any original and all copies, including electronic copies and media, containing customer tax returns, files, and records; and

9.   Order White to transfer the telephone number for the former Franchised Businesses to Liberty.

Respectfully submitted this May 1, 2020

GORDON REES SCULLY MANSUKHANI, LLP

By: _/s/ Kirstie Simmerman_ _____
Kirstie Simmerman, *Lead Counsel*
Texas Bar No. 24083858
ksimmerman@grsm.com
Nathan D. Pearman
Texas Bar No. 24074872
npearman@grsm.com

2200 Ross Avenue, Suite 3700
Dallas, Texas 75201
214-231-4660
214-461-4053 (Facsimile)

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 1, 2020, the foregoing Motion, and Memorandum in

Support was filed with the Clerk of Court using the CM/CMF system, and copies sent (Including

a copy of the Proposed Order) via U.S. Mail to the following:

Mickey White
212 CR 206A
Cameron, TX 76520

***Defendant***

*/s/ Kirstie Simmerman*
Kirstie Simmerman